JOSLYN MANUFACTURING COMPANY

v.

T.L. JAMES & COMPANY, INC. et al.

Civ. A. No. 87–2054.

United States District Court,
W.D. Louisiana,
Shreveport Division.

July 8, 1993.

Jay Canel, Stephen Davis, William Jones, Canel, Davis & King, Chicago, IL, Haller Jackson, III, Tucker, Jeter, Jackson & Hickman, Shreveport, LA, for plaintiff Joslyn.

Robert Shuftan, Steven Danekas, Wildman, Harrold, Allen & Dixon, Chicago, IL, J. Fleet Howell, Wiener, Weiss, Madison & Howell, Shreveport, LA, for defendant Koppers Co., Inc., now known as Beazer East, Inc.

Bobby Gilliam, Penny Sellers, Wilkinson, Carmody, Gilliam & Hussey, Shreveport, LA, for defendant LA & AR Rwy. Co.

## MEMORANDUM RULING

STAGG, District Judge.

This action was brought by Joslyn pursuant to 42 U.S.C. § 9613(f)(1) to recover contribution for alleged response costs incurred by Joslyn in complying with orders of the Louisiana Department of Environmental Quality to investigate and clean up the Lincoln Creosoting site and for declaratory judgment concerning liability for costs and any future removal or remediation action from persons who allegedly may be liable for those costs pursuant to 42 U.S.C. § 9607(a). Joslyn makes identical state law claims pursuant to the Louisiana Environmental Quality Act ("LEQA"), which allows double damages and attorney's fees to be awarded. *See* La.Rev. Stat. 30:2276(G)(1) and (2) and 30:2272(9)(a). Louisiana and Arkansas Railway Company ("L & A") has filed counterclaims against Joslyn and cross-claims against Koppers under CERCLA and the LEQA and pursuant to certain lease agreements executed among the parties. Koppers has filed a counterclaim against Joslyn and a cross-claim against L & A under CERCLA, seeking contribution, indemnity and declaratory relief. This case was tried to the bench from March 15 to March 18, 1993.

## I. THE FACTS

The parties set forth the following facts as admitted and requiring no proof: This lawsuit involves two parcels of contiguous real property located in Bossier City, Louisiana, known as the Lincoln Creosoting site ("the site"). The first parcel contained a wood-treating plant which included building, treating and storage tanks, wood treatment cylinders, black storage areas and other equipment. The second parcel contained industry tracks used in conjunction with the wood-treating operations on the first parcel. The following chart depicts the relevant ownership and leasing history of the two parcels.

| | FIRST PARCEL | SECOND PARCEL |
|---|---|---|
| 1935 | owned by Lincoln Creosoting Co. | owned by L & A |
| 1938 | | portions leased to Lincoln |
| 1950 | August 1, Joslyn purchased first parcel and plant | August 14, Joslyn is assigned Lincoln's leases |
| 1965 | | Joslyn leases additional portions |
| 1967 | | Joslyn again leases additional portions |
| 1969 | December 1, first parcel sold to Koppers | |
| 1970 | | By agreement with L & A, Joslyn's 1967 lease was assigned to Koppers |
| 1971 | first parcel sold to Myatt family | |

Over the course of its 19 years of operations at the site, Joslyn used creosote at the site. In the late 1950s, Joslyn introduced pentachlorophenol ("penta"), another wood preservative, to the site. In the 1960s, Joslyn began to use chromated copper arsenate ("CCA") to treat wood at the site. During Joslyn's operation of the wood treating plant, creosote residue formed underneath and to the sides of the industry tracks on the site, thereby preventing the tram cars from rolling thereon. Periodically, it was necessary for Joslyn employees to remove the sludge on the rails with shovels; the sludge was then used to fill pot holes in its roads. Creosote residue was also used on the ground to serve as the base for 600 linear feet of roads on the site and was sprayed to control weeds and vegetation.[1]

On February 3, 1986, the DEQ issued an order against T.L. James (the parent corporation of Lincoln),[2] Joslyn, Koppers, L & A and others, requiring that a fence be erected around the perimeter of the site within 60 days. Joslyn paid most of the cost of preparing a fencing plan and erecting the fence. L & A, while denying responsibility for the remediation, paid a pro rata portion of the fencing costs. Koppers paid no part of the cost, because Koppers claimed and still claims that it is not a responsible party under either CERCLA or Louisiana law. L & A and Koppers requested a hearing with respect to all matters contained in the DEQ's February 6, 1986 compliance order.

On August 2, 1986, the DEQ issued another order against T.L. James, Joslyn, Koppers, L & A and others, ordering them to develop a plan for investigation of the site and for clean up of "problem areas" discovered during the Phase 1 investigation. Koppers and L & A again denied liability and requested a hearing with respect to all matters contained within the order. Joslyn sub-

mitted to DEQ a document entitled "remedial investigation work plan" prepared by E.R.M.–Southwest, Inc., dated March 15, 1988. On November 17, 1988, the DEQ approved this work plan. Again, Koppers and L & A denied any liability and requested a hearing pursuant to the DEQ's November 17 compliance order.

On April 30, 1991, the DEQ issued an order against T.L. James, Joslyn, Koppers, L & A and others to submit a "remedial action plan" and, upon approval, to implement the plan. Again, Koppers and L & A denied any liability and requested a hearing. On January 17, 1992, Joslyn submitted a "removal action work plan" to the DEQ. On February 28, 1992, Joslyn began excavation at the site. Uniform hazardous waste manifests and weight tickets were prepared for each of the truck loads of soil removed from the site. In June and July of 1992, Joslyn asked the DEQ for permission to stop work at the site; this request was denied. As of the date of trial, Joslyn alleges that it has incurred expenses totaling over $13 million dollars.

## II. LEGAL ANALYSIS

This action was brought by Joslyn pursuant to 42 U.S.C. § 9613(f)(1) of CERCLA for the recovery of response costs. Joslyn has made identical claims pursuant to La.Rev. Stat. 30:2276(9)(A) and (2) and 2272(9)(a) of the LEQA. Joslyn has stated that "[t]his case ought to be decided under both laws [CERCLA and the LEQA] and final judgment ought to be entered in Joslyn's favor and against Koppers and the L & A in an amount and in a manner which greatly encourages the voluntary cooperation and penalizes non-cooperation."[3] *See* Joslyn's Closing Argument at page 2.

---

1. For other subsidiary facts, see the opinion in the companion case, *Joslyn v. Liberty Mutual*, 836 F.Supp. 1273 (W.D.La.1993), issued today.

2. *See Joslyn Corp. v. T.L. James & Co.*, 696 F.Supp. 222 (W.D.La.1988), *aff'd* 893 F.2d 80 (5th Cir.1990), *cert. denied* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991). (Summary judgment granted in favor of T.L. James & Co.

wherein the Court held that, under CERCLA and the LEQA, parent corporation was not liable for the acts of its wholly-owned subsidiaries and piercing the corporate veil was not warranted under the facts of the case.)

3. Joslyn offers no support for this statement; nor is this issue addressed by Koppers or L & A.

The initial question to be addressed is whether this case should be decided under CERCLA, the LEQA, or both. 42 U.S.C. § 9613(f)(1) provides:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

42 U.S.C. § 9614 of CERCLA is entitled "Relationship to other law," and provides in part:

**(a) Additional State liability or requirements with respect to release of substances within State**

Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.

**(b) Recovery under other State or Federal law of compensation for removal costs or damages or payment of claims**

Any person who receives compensation for removal costs or damages or claims pursuant to this chapter shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law. Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter.

■ Under § 9614(b), if Joslyn recovers compensation for response costs from L & A and/or Koppers pursuant to CERCLA then Joslyn is precluded from asserting its identical state law claims against that party. This court does not hold that CERCLA remedies preempt complementary state remedies; in fact, if Joslyn does not receive compensation for its response cost pursuant to CERCLA, then § 9614(b) does not preclude Joslyn's state law claims. Thus, the first analysis is whether Joslyn is entitled to receive compensation from Koppers and/or L & A pursuant to CERCLA.

**A. CERCLA LIABILITY:**

To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a "facility" as defined in Section 9601(9); (2) that the defendant is a responsible person under Section 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs. *Amoco Oil Company v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989). It is undisputed that the site in question is a facility as defined in § 9601(9), that a release or a threatened release of hazardous substance has occurred and that the release or a threatened release has caused Joslyn to incur response costs. What is disputed is whether defendants, Koppers and L & A, are "responsible persons" under § 9607(a).

Joslyn contends that L & A and Koppers owned or operated the facility during a time when hazardous substances were disposed and, therefore, that they are responsible persons pursuant to 42 U.S.C. § 9607(a)(2). This section imposes liability upon

any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of.

This section applies to persons who owned or operated a facility at the time of the disposal of the toxins. *See Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir.1988). Disposal has been defined as:

The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3); *Tanglewood,* 849 F.2d at 1573. In *Tanglewood,* the Fifth Circuit recognized that disposals may occur "when hazardous materials are moved, dispersed, or released during landfill excavations and fillings." *Id.* It is undisputed that Joslyn is a responsible party pursuant to 42 U.S.C. § 9607(a)(2); the issue is whether Koppers and/or L & A are responsible parties pursuant to this section.

**(1) Liability of Koppers under CERCLA**

 Koppers owned the first parcel for a period of 13 months and, during that time, dismantled part of the wood-treating facility. Joslyn contends that there was substantial evidence introduced at trial which established that Koppers allowed a significant amount of hazardous substances to be released onto the site when Koppers dismantled the plant. Joslyn also contends that since Koppers dismantled the entire plant it *necessarily* follows that Koppers was an owner at the time of disposal of hazardous wastes. The court does not reach this second contention because the evidence introduced at trial does not establish that Koppers dismantled the entire plant, rather the evidence only establishes that Koppers removed two treatment cylinders and some railroad ties from the site.[4]

The only evidence which would suggest that Koppers completely dismantled the entire plant is the testimony of Tommy Vague, who claimed that he visited the site during

Koppers' ownership in April 1970 and saw no tanks or cylinders at the site. His testimony was punctuated by, "I don't recall," or "I don't remember that." The court does not find Mr. Vague's recollection to be credible, in light of the conflicting testimony of Ronald Stewart and James Maybry. Mr. Stewart and Mr. Maybry, employees of Koppers, visited the site in the fall of 1970. Mr. Stewart testified that the storage tanks were still at the site, and Mr. Maybry testified that cylinders and tanks remained at the site. Furthermore, an aerial photograph taken in September of 1970 indicates that, although two cylinders had been removed, the working and storage tanks were still present on that date. *See* L & A Exhibit 37. The court finds that the evidence does not establish that Koppers dismantled the entire treatment plant nor does it establish that Koppers allowed any amount of hazardous substances to be discharged onto the site because not a single witness testified to facts of any spillage by Koppers. Joslyn has simply failed to prove by a preponderance of the evidence that Koppers owned or operated the site *at the time of* disposal of toxins.

 Joslyn asserts that "even if Koppers had not moved a grain of dirt, it would still be liable" under *Nurad v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.1992).[5] In *Nurad,* the Fourth Circuit held that, "Section 9607(a)(2) imposes liability not only for active involvement in the 'dumping' or 'placing' of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was 'spilling' or 'leaking.'" *Id.* at 846. *Nurad* is distinguishable in that, at the time the *Nurad* defendants owned the site, the storage tanks were actively leaking. The Court noted that the definition of "disposal" could encompass both active and pas-

---

4. Koppers did not disassemble the two cylinders they removed from the site. According to the testimony of Bernett Bartley, a former Koppers employee, the two cylinders were merely lifted from the concrete pads on which they had sat and loaded onto a train. Koppers also removed some railroad ties by simply lifting them from the ballast.

5. As further support for imposing liability on Koppers, Joslyn, in its Reply Argument, quotes the following statement from *In the Matter of*

*CMC Heartland Partners,* 966 F.2d 1143, 1146 (7th Cir.1992):

> As the owner, § *107(a)(1),* Exxon could be responsible today for cleanup under § 106(a), even though it played no role in depositing the paint sludge.

(emphasis added). As evidenced by Joslyn's own citation, however, this case concerned the liability of *current* owners under § 9607(a)(1), not past owners such as Koppers, under § 9607(a)(2).

sive elements, since leaking or spilling may occur without any active human participation. There is no evidence that leaking or spilling of hazardous substances occurred during Koppers' brief period of ownership.[6] This court does not agree with Joslyn's contention that § 9607(a)(2) liability should be extended to all prior owners solely on the basis that rainfall obviously causes hazardous materials to leach through the soil.

In sum, Joslyn has failed to sustain its burden of proof in order to recover against Koppers under CERCLA.

### (2) Liability of L & A under CERCLA

Joslyn alleges that it is entitled to recover a portion of its costs from L & A because L & A owned the second parcel. Joslyn is not asserting a CERCLA claim against L & A for transporting treatment chemicals to the site, this claim is only being asserted pursuant to the LEQA. *See* Joslyn's Reply Brief at p. 12.

Lincoln leased portions of the second parcel from L & A in 1942 and 1949 which leases were assigned to Joslyn in 1950. Joslyn subsequently executed two additional leases with L & A dated 1955 and 1967. The two original Lincoln leases and the two subsequent Joslyn leases all contained indemnity provisions.[7] The indemnity provision contained in the 1942 lease assigned to Joslyn provides in part:

> Lessee forever shall defend, indemnify as an insurer, and save harmless Carrier from, for and against any and all liability, judgments, outlays and expenses (1st) consequent on any injury, death, damage, loss or destruction (a) suffered or caused by or to any person or property incident to or while being engaged or being used in the doing of whatsoever Lessee attempts hereunder, or while on Premises for any reason whatsoever....

*See* L & A's Trial Exhibit No. 2. The 1949, 1955 and 1967 leases contained an indemnity provision which provides in part:

> The Lessee agrees to indemnify the Railway Company and save it harmless from any and all claims and expenses that may arise or may be made for death, injury, loss or damage, resulting to the Railway Company's employees or property, or to the Lessee or Lessee's employees or property, or to other persons or their property, arising from or happening in connection with or during the occupancy or use of said Premises of the Lessee, whether or not caused by the negligence of the Railway Company, and resulting from fire or any other cause, excepting only loss or damage to the premises of the railway company, or to rolling stock, or to Lessee's shipments in the course of transportation, when such loss or damage is caused solely by fire set by locomotives operated by the Railway Company.

*See* L & A's Trial Exhibits Nos. 3, 5 and 6. Although the indemnity provisions make no specific reference to environmental damage, it was clearly the intent of the parties to transfer to the Lessee all liability whatsoever for any damage that the Lessee caused.

Joslyn, itself executed the 1955 and 1967 leases; therefore, Joslyn is clearly bound by the indemnity provisions contained therein. It is also clear that Joslyn is bound by the indemnity provisions in the 1942 and 1949 leases from the date Joslyn was assigned these two leases, which was August 14, 1950. The real issue is whether Joslyn, as assignee, is obligated to indemnify L & A for any damages caused by Lincoln *prior* to the assignment on August 14, 1950.[8]

An assignment of a lease differs from a sublease in that an assignment is the complete transfer or sale of the lease.[9] A sub-

---

6. Irving Kuecker, the last Joslyn employee at the site, could not even verify whether the storage tanks were left full after Joslyn's operations ceased. Mr. Kuecker testified that he closed all valves, checked for leaks and turned off the electricity, but that he did not check the gauges on the tanks.

7. Indemnity provisions are enforceable under CERCLA and the LEQA. *See* 42 U.S.C. § 9607(e)(1) and La.Rev.Stat. 30:2276(I).

8. The parties stipulated that the assignment occurred on August 14, 1950. *See* Pretrial Order stipulated fact number 10.

9. An assignment or transfer of credits is a species of sale. La.C.C. art. 2642; *Scott v. Cor-*

lease creates a new contract between the lessee and the sublessee to which the original lessor is not a party. "Where there is an assignment of the lease, however, the assignee is liable to the original lessor for the obligations which he has assumes completely." *See Mire v. Sunray DX Oil Company et al.*, 285 F.Supp. 885, 888 (W.D.La.1968). In general, "[t]he transfer of an obligation is the substitution of a new person for one of those between whom the legal relation was originally established, without altering in any manner the relation itself." *Louisiana Civil Law Treatise, The Law of Obligations*, Litvinoff § 10.1 p. 246.[10]

■ Lincoln assigned the entire 1942 and 1949 leases to Joslyn, no new leases were created nor was the "purchase and transfer" limited to the remaining or prospective period of the leases. In fact Joslyn purchased from Lincoln:

all of its right, title and interest in ... Lease Agreement dated June 11, 1942 ... [and] Lease Agreement dated November 11, 1949.... [Joslyn] agree[d] to carry out and perform, as well as to be bound by all terms and provisions of said ... Lease Agreements of June 11, 1942 and November 11, 1949....

Joslyn, therefore, in effect, purchased and assumed *Lincoln's obligation* to defend and indemnify L & A for any damage resulting from the lessee's use of the property. Joslyn is required to defend and indemnify L & A for any damage resulting from its own use or Lincoln's use of the property.[11]

■ L & A was owner of the second parcel during the entire time·at issue. L & A is clearly liable to Joslyn for response costs under CERCLA because L & A is a past owner of parcel 2 of the site and owned this property at the time hazardous substances were disposed. Any amount for which L & A owes Joslyn under CERCLA as a past owner, however, is **MOOT,** because any such amount is **CANCELLED OUT** by the fact that Joslyn is ultimately liable for any such amount under the indemnity provisions of the four leases at issue.

## B. LEQA LIABILITY:

La.Rev.Stat. 30:2273 provides that the following persons or entities are subject to the Louisiana Act:

(1) The owner, operator, or lessee of any pollution source or facility.

(2) Any person who has directly transported or directly contracted for the transportation of a hazardous substance or hazardous waste to a pollution source or facility.

(3) Any person who generated a hazardous waste which was eventually transported, stored, disposed of or discharged at a pollution source or facility.

(4) Any other person who disposed of or discharged a hazardous substance at a pollution source or facility.

Pursuant to La.Rev.Stat. 30:2276(G), Joslyn contends that Koppers and L & A are liable to Joslyn for twice their share of the

---

*kern,* 231 La. 368, 91 So.2d 569 (1956). A true assignment, although done for the purpose of serving as a security device, is nevertheless a transfer of ownership. *American Bank & Trust Co. v. Louisiana Sav. Ass'n,* 386 So.2d 96 (La. App. 3d Cir.1980). A general assignment can be the vehicle for either transferring ownership or securing an obligation. Former La.Rev. Stat. 9:3101(9), now 9:3101(6). An assignment operates as an assignment, a sale or a pledge, or any combination thereof, depending on the intent of the parties. La.Rev.Stat. 9:3102(A). *Shell Western E & P, Inc. v. Driers, Inc.,* 572 So.2d 323, 325 (La.App. 3d Cir.1990).

10. The court notes that passages from the treatises cited by Joslyn in their Reply Brief are distinguishable as they refer to the common law and are limited to the liability of an assignee created by *privity of estate.* The court also finds that one

case cited in Koppers' Closing Argument Brief on this issue is distinguishable as it was decided under Texas law and concerned a sublease rather than an assignment.

11. The court notes that the transfer of the leases did not constitute a novation, as the assignment did not purport to discharge Lincoln; thus, Lincoln also remained liable to L & A under the terms of the indemnity provisions. Additionally, in October 1970, when Koppers assumed the 1967 lease agreement between Joslyn and L & A, the transfer of the lease was merely an assignment of the lease and not a novation. Thus, Joslyn was not released from any liability that it might owe to L & A, just as Lincoln was not released from liability when it assigned its leases to Joslyn.

response costs, as L & A and Koppers are non-participating parties.[12] La.Rev.Stat. 30:2276(F) provides:

> All persons who have generated a hazardous substance disposed of at the site, transported a hazardous substance to the pollution source or facility, contracted to have a hazardous substance transported to the pollution source or facility, or disposed of a hazardous substance at the pollution source or facility shall be presumed to be liable in solido by the court for the cleanup of the site unless a party shows by a preponderance of the evidence that the costs of remediation should be apportioned and there is a reasonable basis for determining the amount of the contribution of each party to the discharge or disposal, however, any party shall have the right to establish his proportionate contribution to the site and his liability shall be limited to his degree of contribution.

La.Rev.Stat. 30:2276(G) provides that participating parties who agree to clean up the facility prior to suit may sue and recover from any other non-participating party twice their portion of the remedial costs. Prior to suit the participating party must make a written demand on any non-participating party they intend to sue for payment of that portion the nonparticipating party would be liable for if he participated.

### (1) Liability of Koppers under the LEQA

■ To establish a claim for contribution under the LEQA, Joslyn must prove that Koppers disposed of a hazardous substance at the site. For the reasons stated in the previous section concerning Koppers' liability under CERCLA, Joslyn has failed to establish that Koppers disposed of or discharged a hazardous substance at the Lincoln Creosoting site in Bossier City. Thus, Joslyn has failed to establish the liability of Koppers under the LEQA.

### (2) Liability of L & A under the LEQA

■ Section 9614(b) precludes Joslyn from asserting its identical state law claims under the LEQA against L & A because technically it has been held that Joslyn is entitled to recover response cost from L & A. In reality, however, this recovery is extinguished by Joslyn's obligation to indemnify L & A for any such recovery. Even if § 9614(b) of CERCLA did not preclude Joslyn's identical state law claims, for the reasons previously stated, any amount Joslyn would be entitled to recover from L & A under the LEQA would also be cancelled out by Joslyn's obligation to indemnify L & A.

■ Joslyn has asserted only a claim under the LEQA, not CERCLA, against L & A for liability as a transporter of hazardous substances to the site. La.Rev.Stat. 30:2276(F) provides that transporters of the hazardous substance to the facility shall be presumed liable in solido unless that party shows by a preponderance of the evidence that the costs of remediation should be apportioned. La.Rev.Stat. 30:2276(G) allows participating parties who have agreed to clean up the site prior to suit to sue other nonparticipating parties for twice their share. The Louisiana courts have not yet interpreted the relevant LEQA provisions on transporter liability; therefore, it is appropriate for the court to look to the interpretation of similar federal statutory provisions for guidance. *See Williams v. Conoco, Inc.*, 860 F.2d 1306 (5th Cir.1988) and *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So.2d 1149, 1158 (La.1986).

Section 9613(f), which allows recovery of contribution from other parties, is the CERCLA counterpart to La.Rev.Stat. 30:2276(G). Section 9613(f) allows a party to seek contribution from any party potentially liable under § 9607(a). Section 9607(a)(4) governs the liability of transporters of hazardous substances and requires that the per-

---

12. A non-participating party is:
 a person who refuses to comply with the demand of the Secretary, or fails to respond to the demand, or against whom a suit has been filed by the Secretary.
 La.Rev.Stat. 30:2272(6). For reasons to follow, the court does not reach the issue of whether Koppers and L & A are truly "nonparticipating" parties under the LEQA, since, after the issuance of the DEQ orders, hearings were requested by the parties which still have not been held, despite the passage of a significant amount of time.

son must have *selected* the site for liability to result. Mere transportation of the hazardous substance to the site is insufficient. *See also U.S. v. Western Processing Co., Inc.,* 756 F.Supp. 1416 (W.D.Wash.1991); *U.S. v. New Castle County,* 727 F.Supp. 854 (D.Del.1989); and *Alcatel Information Systems, Inc. v. State of Arizona,* 778 F.Supp. 1092 (D.Ariz. 1991). This court finds that the LEQA provisions on transporter liability for contribution to other parties, interpreted in light of CERCLA, require more than mere transportation of the hazardous substance to the site.[13] There is no evidence that L & A acted as anything more than a mere commercial carrier of the hazardous substance to the site. Lincoln and Joslyn were the parties who contracted for the transport of the creosote and they, also, selected the site. Joslyn has failed to establish a claim against L & A under the LEQA for transporter liability.

## III. CONCLUSION

Joslyn has failed to prove its claims against Koppers under both CERCLA and the LEQA. Any claims, under CERCLA or the LEQA, that may be sustained against L & A as past owner of parcel 2 are moot because of Joslyn's duty to indemnify L & A for any such award. Joslyn has also failed to prove a claim against L & A for transporter liability under the LEQA.

**IT IS ORDERED** that Koppers and L & A shall jointly submit a judgment consistent with the terms of this memorandum ruling within ten (10) days of its filing.

---

13. The court also notes that in La.Rev.Stat. 32:1519, which governs hazardous material transportation and provides for the reimbursement of remedial costs to the state for clean up of a facility, transporter liability only results if it can be shown that the hazardous substance "was discharged or disposed of *directly by the transporter and the transporter directly caused the discharge or disposal* for which the remedial action must be undertaken." (emphasis added)